```
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF OHIO
 2                    WESTERN DIVISION

 3   UNITED STATES OF  AMERICA,     ) Docket No. 1:07CR647

 4           Plaintiff.            )  Toledo, Ohio

 5              v.                 )  July 12, 2010

 6   ZUBAIR AND KHALEEL AHMED      )  Sentencing

 7           Defendants.           )

 8   -----------------------------

 9                TRANSCRIPT OF SENTENCING
                BEFORE THE HONORABLE JAMES G. CARR
10                UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiffs:   Justin E. Herdman
                           Thomas E. Getz
13                         Office of the U.S. Attorney
                           801 Superior Avenue, W
14                         Suite 400
                           Cleveland, Ohio 44113
15                         (216) 622-3840

16

17                         AND

18                         Gregory N. Sofer
                           Office of the U.S. Attorney
19                         816 Congress Avenue
                           Austin, TX 78701
20                         (512) 916-5854

21                         AND

22                         Jerome J. Teresinski
                           U.S. Department of Justice
23                         10th & Constitution Avenue, NW
                           Washington, DC 20530
24                         (202) 514-7146

25
```

```
 1   For the Defendant, Zubair Ahmed:
                             Andrea L. Whitaker
 2                           Terry H. Gilbert
                             Friedman & Gilbert
 3                           600 Standard Building
                             Cleveland, Ohio 44113
 4                           (216) 241-1430

 5

 6   For the Defendant, Khaleel Ahmed:
                             Michael Slade
 7                           Alyssa A. Qualls
                             Kirkland & Ellis
 8                           300 North LaSalle Street
                             Chicago, IL 60654
 9                           (312) 862-2000

10

11   Court Reporter:         Angela D. Nixon, RPR, CRR
                             1716 Spielbusch Avenue
12                           Toledo, Ohio 43624
                             (419) 260-5259

13

14   Proceedings recorded by mechanical stenography, transcript

15   produced by notereading.

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2              COURTROOM DEPUTY:  Case number 1:07CR647, United
 3    States of America versus Zubair Ahmed and case number
 4    07CR647, United States of America versus Khaleel Ahmed.
 5    Matter's called for sentencing.
 6              THE COURT:  Okay.  Starting with the government
 7    counsel, if you'll simply identify yourselves for the
 8    record.
 9              MR. HERDMAN:  Justin Herdman for the United
10    States.
11              MR. SOFER:  Greg Sofer for the United States.
12              MR. GETZ:  Thomas Getz for the United States.
13              MR. TERESINSKI:  Good morning, Your Honor, Jerome
14    Teresinski for the United States.
15              THE COURT:  And I believe a couple agents are
16    here.
17              MR. HERDMAN:  Yes.  Joseph Bertoldi from FBI
18    Chicago and Shannon Coats from FBI Toledo.
19              THE COURT:  Okay.  And for the defendants?
20              MR. GILBERT:  Terry Gilbert for Zubair Ahmed.
21              MS. WHITAKER:  Andrea Whitaker for Zubair Ahmed.
22              MR. SLADE:  Good morning, Your Honor.  Michael
23    Slade for Khaleel Ahmed.
24              MS. QUALLS:  And Alyssa Qualls for Khaleel.
25              THE COURT:  And also present is Ms. Myrna
```

1    Greenwood from pretrial service and probation office,

2    although the office who prepared the report is not

3    available today, Shawna Sizemore.

4              Mr. Herdman, you'll be speaking for the

5    government?

6              MR. HERDMAN:  Yes, Your Honor.

7              THE COURT:  Have you received and reviewed the

8    presentence reports?

9              MR. HERDMAN:  I have for both defendants, Your

10   Honor.

11             THE COURT:  And do you have any objections?

12             MR. HERDMAN:  I do not.

13             THE COURT:  And if not, are you prepared to

14   proceed with sentencing?

15             MR. HERDMAN:  Yes, Your Honor.

16             THE COURT:  Mr. Gilbert?

17             MR. GILBERT:  Yes, Your Honor.

18             THE COURT:  Have you received and reviewed the

19   presentence report?

20             MR. GILBERT:  Yes, Your Honor.  We've received

21   the presentence report, the original one, and we went over

22   it very carefully with our client, Zubair Ahmed.

23   Subsequently we sent a letter to the probation officer with

24   some objections, which were duly noted in the final

25   version.

1          THE COURT:  Okay.  And I will go through those in

2     a moment.  Mr. Ahmed, did you read the presentence report?

3          ZUBAIR AHMED:  Yes.

4          THE COURT:  Did you understand what it says and

5     what it means?

6          ZUBAIR AHMED:  Yes, I do.

7          THE COURT:  And don't want to know what you said

8     to Mr. Gilbert or he or may have said to you, but did you

9     discuss it with him?

10         ZUBAIR AHMED:  Yes.

11         THE COURT:  And did he take the time and give you

12    the attention to answer all your questions?

13         ZUBAIR AHMED:  Yes, he did.

14         THE COURT:  And are you satisfied that you fully

15    understand what the report says, and as I said, what it

16    means?

17         ZUBAIR AHMED:  You mean do I understand it?

18         THE COURT:  Yes.

19         ZUBAIR AHMED:  I'm not satisfied with the report

20    but I'm satisfied with the fact that I understood it.

21         THE COURT:  Now, with regard to dissatisfaction,

22    has the dissatisfaction that you have, has that been

23    communicated to me by your attorneys in their objections to

24    the report?

25         ZUBAIR AHMED:  Yes, it has.

```
 1              THE COURT:  Okay.  In other words, you're
 2     satisfied with what they have done, but not with some
 3     portions of the report; is that correct?
 4              ZUBAIR AHMED:  Yeah.  Yes.
 5              THE COURT:  Now, your attorneys have represented
 6     you for a long time in this proceeding, and I think from
 7     the outset; is that correct?
 8              MR. GILBERT:  Yes, Your Honor.
 9              THE COURT:  And Mr. Ahmed, are you satisfied with
10     the work that your lawyers have done for you and with you
11     throughout the entire course of these proceedings?
12              ZUBAIR AHMED:  Yes, I am.
13              THE COURT:  Okay.  Have they given you enough
14     time and attention to make you feel confident that you and
15     they have been well prepared for everything that's happened
16     at every stage of these proceedings?
17              ZUBAIR AHMED:  Yes, sir.
18              THE COURT:  Is there any way in which you are at
19     all dissatisfied with anything that they've done for you?
20              KHALEEL AHMED:  Could you repeat that?
21              THE COURT:  Is there any way that you are
22     dissatisfied or unhappy with anything that your two lawyers
23     have done for you?
24              KHALEEL AHMED:  I am not dissatisfied.
25              THE COURT:  Okay.  Okay.  And are you prepared
```

 1   for sentencing today?

 2            ZUBAIR AHMED:  Yes, I am, sir.

 3            THE COURT:  Mr. Slade, likewise, have you

 4   received and reviewed the presentence report?

 5            MR. SLADE:  Your Honor, similar to Mr. Gilbert,

 6   we did receive an initial copy of the PSR.  We sat down

 7   with Khaleel and discussed it with him in some detail,

 8   communicated a number of objections of the probation

 9   officer, some of which altered the report and others which

10   are noted at the end of the probation officer's report.

11            THE COURT:  Did you discuss it with your client?

12            MR. SLADE:  Our office did discuss the PSR with

13   Mr. Ahmed extensively, yes.

14            THE COURT:  Okay.  And your office being

15   co-counsel?

16            MR. SLADE:  One of my colleagues was the primary

17   person discussing it with Mr. --

18            THE COURT:  And who was that, just for the

19   record?

20            MR. SLADE:  Alex Solotorovsky.

21            THE COURT:  Mr. Ahmed, did you see a copy of the

22   presentence report?

23            KHALEEL AHMED:  Yes, Your Honor.

24            THE COURT:  Did you read it?

25            KHALEEL AHMED:  Yes, sir.

1          THE COURT:  Did you understand what it says and

2    what it means?

3          KHALEEL AHMED:  I understood what it says.

4          THE COURT:  Did you have an opportunity to go

5    over the report with one or more attorneys representing

6    you?

7          KHALEEL AHMED:  Yes, I did.

8          THE COURT:  And did that lawyer take the time and

9    give you the attention sufficient to answer any questions

10   you might have had about the presentence report?

11         KHALEEL AHMED:  Yes, they did, Your Honor.

12         THE COURT:  And are you satisfied with the

13   lawyer -- lawyers have taken enough time to prepare you and

14   them for sentencing today?

15         KHALEEL AHMED:  Yes, sir.

16         THE COURT:  And as I asked your cousin, have your

17   lawyers done so, in other words, have they taken the time

18   and given you the attention in case -- the attention that

19   you wanted them to give throughout the entire course of

20   these proceedings?

21         KHALEEL AHMED:  Yes, that's fine.

22         THE COURT:  And is there any way that you're not

23   happy with what they've done with and for you in this case?

24         KHALEEL AHMED:  I am satisfied with everything.

25         THE COURT:  You think that they've done all that

1    they can and do done so well on your behalf?

2              KHALEEL AHMED:  Yes, Your Honor.

3              THE COURT:  Okay.  Mr. Slade, are there any

4    unresolved objections with regard to your client?

5              MR. SLADE:  Yes, Your Honor.  Those are set forth

6    at the end of the probation officer's report.

7              THE COURT:  Let's turn to those first.  Looking

8    at page 23 of the report.

9              MR. HERDMAN:  Your Honor --

10             MR. GILBERT:  Your Honor, are you referring to --

11             THE COURT:  I'm referring to Khaleel Ahmed.

12             MR. SLADE:  Your Honor, I believe the unresolved

13   objections appear at the bottom of page 24.

14             THE COURT:  Well, with regard to the first, I

15   simply noted that, and I understand what you're saying

16   that's on page 23.  It's my understanding with regard to

17   objection number one, the unresolved one that they have on

18   page 24 is that basically the parties have agreed and

19   stipulated in the plea agreement to the applicable

20   sentencing guideline, applicable provision of sentencing

21   guidelines and resulting base offense level computations.

22   It's also my understanding that under Rule 11, 1(c)1, that

23   I am bound by those agreements.  Mr. Herdman, would you

24   agree with that?

25             MR. HERDMAN:  I would, Your Honor.

```
 1              THE COURT:  Mr. Slade, would you agree with that?
 2              MR. SLADE:  I do, Judge, thank you.
 3              THE COURT:  So I will have to -- I will find that
 4    the objection is well taken, and I will abide by the
 5    computations as agreed to by the parties.
 6              MR. SLADE:  Your Honor, I believe it's the same
 7    identical issue for objection two.
 8              THE COURT:  Okay.  So Mr. Herdman, likewise, is
 9    that parties have agreed to essentially what the maximum
10    term of supervised release is three years?
11              MR. HERDMAN:  That is what we agreed to.
12              THE COURT:  So it's your contention and
13    representation that I am bound by that agreement --
14              MR. HERDMAN:  Yes, Your Honor.
15              THE COURT:  -- between the parties?  Okay.  And
16    then it's my understanding the plea agreement between the
17    parties is -- the total base offense level is 23, and the
18    criminal history category was six; is that correct,
19    Mr. Herdman?
20              MR. HERDMAN:  As for Khaleel Ahmed, yes.
21              THE COURT:  Yes, let's make that clear.  And
22    again, Mr. Slade, that's --
23              MR. SLADE:  Your Honor, that's correct.
24              THE COURT:  Okay.  And that would result in a
25    advisory guideline range of 92 to 115 months; is that --
```

```
 1              MR. HERDMAN:  Yes.

 2              MR. SLADE:  Yes, Your Honor.

 3              MR. HERDMAN:  Your Honor, I should point out

 4    that -- that base offense level envisions the triggering of

 5    certain provisions within the plea agreement, motion by the

 6    government as well.

 7              THE COURT:  I understand that.  Okay.  Are there

 8    any other objections --

 9              MR. SLADE:  None, Your Honor.

10              THE COURT:  -- unresolved.

11              MR. SLADE:  They're all set forth in the PSR.

12              THE COURT:  Mr. Gilbert and Mrs. Whitaker with

13    Zubair Ahmed, I believe those objections begin on page 26?

14              MR. GILBERT:  Yes, Your Honor.  It's on our

15    report.  It's objection number three regarding the same

16    issue of the guideline calculations.

17              THE COURT:  And obviously the same ruling.

18              MR. GILBERT:  Same ruling, and also objection

19    number four is the term of supervised release.

20              THE COURT:  Same situation, same ruling, correct?

21              MR. GILBERT:  Correct.

22              THE COURT:  Okay.  And what else remains

23    unresolved?

24              MR. GILBERT:  Your Honor, there are a number of

25    relatively minor factual objections that are listed.
```

```
 1          THE COURT:  Starting at page 26?

 2          MR. GILBERT:  Page 24.

 3          THE COURT:  Can I see your copy because mine's

 4   number 26.  Okay.  I'm going to go through these one by

 5   one, paragraph eight.

 6          MR. GILBERT:  Your Honor, let me just

 7   preliminarily state that many of these objections are

 8   derived from a previous indictment in the manner that was

 9   dismissed.  And so when I went over the presentence report

10   with my client, there were certain things that we felt that

11   were either inaccurate or there were competing versions

12   that nuances.  For example, there was a firearm for example

13   that was --

14          THE COURT:  Paragraph eight?

15          MR. GILBERT:  -- purchased after -- after he was

16   already represented by counsel in this matter in Chicago.

17   And it was returned, and it was -- we don't really believe

18   it had anything to do with this case.

19          We also believe that there was references to

20   steroids, somehow that was alleged to have been part of the

21   bearing on the conspiracy of the plan.  Zubair had been a

22   body builder, or he had been into exercise and he had done

23   this notwithstanding whatever allegations were in this

24   case.  Going to the shooting range, he went with friends

25   that were not part of this case for a day of recreation.  I
```

```
 1    mean, can it be used as evidence in a trial?  Probably.
 2    But he wanted me to indicate that there were other reasons
 3    for it as well.  And since this report goes to the Bureau
 4    of Prisons, we wanted to at least reflect that there was
 5    some alternative notions with respect to those allegations.
 6    But once again, they did come from a charging instrument
 7    that had been dismissed.  And we believe that the factual
 8    basis of the plea agreement should really form the nucleus
 9    of facts in this case.
10              MR. HERDMAN:  Your Honor, can I just respond?
11              THE COURT:  If I may, those are principally, it
12    seems, recitations of the indictment which, candidly, is
13    not particularly helpful.  Here I am, and here he is.
14              MR. HERDMAN:  And I think the indictment has not
15    been dismissed yet.  It was to be dismissed on the date of
16    sentencing, so it is still a superceding indictment that
17    forms the basis.  It was the initial indictment in this 647
18    case that has not been dismissed yet, and so therefore, the
19    document's still, I would say, relevant, however helpful it
20    may or may not be.
21              THE COURT:  My inclination, I'll go through this
22    one by one, but my inclination in situations like this, I'm
23    not going to pay any attention to whatever misinformation
24    or misinterpretation you find bothersome, won't play a role
25    in my sentence.
```

1              MR. GILBERT:  I understand.  And we felt -- we

2     felt compelled to put this in our objections.  I mean,

3     there was some references to certain, like, suicide vest

4     construction which he had nothing to do with.  Some of this

5     information might have applied to other previous

6     co-defendants and things like that.  And if you read this,

7     it might look like he's worse than he really is.  And so I

8     think it needs to be put into prospective.  It's in there.

9     It's noted.  The Court can disregard it as it's indicated

10    and that's fine.

11             THE COURT:  Okay.  Let me go through these.  To

12    the extent it has any bearing with regard to the attempt to

13    purchase a firearm, and I'll accept the representation that

14    there's legitimate purposes for doing so.  And in any

15    event, I'm not going to pay any attention to that

16    statement.  The challenge -- same, I will take cognizance

17    of the objection or statement in paragraph 9 that training

18    and so forth, it's not exclusively geared towards engaging

19    in Jihad, and I will accept that representation, and I will

20    disregard any suggestion to the contrary.

21             The same, I will with regard to paragraph 10, I

22    will simply base my sentence on the understanding that that

23    activity had nothing to do with preparing for Jihad.

24             And I will accept paragraph 11 as an accurate

25    representation of the situation and disregard anything to

1     the contrary.

2               Likewise with paragraph 18.

3               And I will also accept the representation as

4     being accurate in paragraph 21 and disregard any suggestion

5     to the contrary to PSI.

6               MR. HERDMAN:  Your Honor, I apologize.  I'm just

7     trying to clarify with respect to the findings that you're

8     making right now, these are essentially -- my understanding

9     what you're doing is that you are essentially saying your

10    sentence is not going to rely on the facts for the

11    objections that have been noted with respect to these

12    particular paragraphs that are in the indictment, which the

13    government will concede that is not all that helpful --

14              THE COURT:  That's correct.

15              MR. HERDMAN:  -- in finding a factual -- the

16    factual findings you have to make with respect to sentence.

17    But we obviously -- we have a different take on the facts

18    as they were --

19              THE COURT:  The problem is, the only facts that

20    I've got from the government are the recitation in the

21    indictment.  And to resolve these with factual findings as

22    to which is true and which is not true, I would have to sit

23    down and conduct a series of hearings, take evidence, and

24    make a ruling, and I'm not about to do that.

25              MR. HERDMAN:  Nor are we.

```
1              THE COURT:  I'm simply saying, given the fact

2    that all I have from the government is the indictment, I'm

3    going to favor the defendant by accepting his

4    representations.  And where they conflict, I will accept

5    his representations as accurate and will disregard

6    anything -- any assertion of fact or inference to the

7    contrary that may be found in the indictment.  The

8    indictment's just a charging instrument.  It's not proof of

9    anything.

10             MR. HERDMAN:  And we also do intend, Your Honor,

11   to rely on the facts that were in the sentencing memorandum

12   which were submitted which were a little more descriptive

13   with respect to the conduct of the offense.

14             THE COURT:  I understand.  But I believe under

15   the guidelines, when confronted with objections that would

16   apply to a great deal of time and taking of testimony to

17   resolve them, and these would, and wind up having a week or

18   two's worth of trial, a week or three or four days or

19   whatever doesn't seem to make any sense because I don't

20   think any of them really ultimately are material or will

21   have any effect on my sentence one way or another.

22             MR. HERDMAN:  Okay.  Thank you.

23             THE COURT:  What matters to me is what is

24   contained in the plea agreement.  Certainly with regard to

25   paragraph 22 and 23, paragraphs 22 and 23, that's my
```

1    recollection of the evidence, that at one point after the

2    initial contact between the Ahmed cousins and Mr. El-Hindi

3    and others, they kind of wandered away and, despite the

4    urgings of the government's agent, no further contact was

5    had, is that correct, Mr. Gilbert?  That's my recollection.

6         MR. GILBERT:  There was a possibility of having

7    further contact, but it never materialized.

8         THE COURT:  It never materialized.  Yeah.

9         MR. HERDMAN:  There was a telephone call, Your

10   Honor, which was pointed out in the sentencing memorandum,

11   but there was no face-to-face contact.

12        THE COURT:  Right.  There were no specific

13   arrangements to meet, and there was no firearm instruction

14   on July 4th.  There was some talk about weapons and

15   shooting machine guns and all that.  Okay.

16        Paragraph 36 I'll accept that as accurate.

17        Paragraphs 37, 38, 39, once again, I'll accept

18   that there were a variety of subject matters, including

19   those which were entirely innocent and had nothing to do

20   with Jihad.  There was -- and I think paragraph 45 is

21   correct.  Isn't that what the evidence showed, that is the

22   only individual who's with Zubair Ahmed at the convention

23   in Cleveland and was part of the conspiracy is

24   Mr. El-Hindi, that's correct?

25        MR. HERDMAN:  Other than Mr. Griffin?

```
 1              THE COURT:  That's right.

 2              MR. GILBERT:  I didn't count him.

 3              MR. HERDMAN:  And Khaleel Ahmed was there as

 4    well.

 5              THE COURT:  I understand, but he never met

 6    Mr. Mazloum or Mr. Amawi.

 7              MR. HERDMAN:  No.

 8              THE COURT:  That's correct.  I'm going to accept,

 9    as I think I already have, the representation that the

10    purpose was lawful and legitimate for purchasing or trying

11    to purchase a firearm.  I think it's also fair to at least

12    have a sense that whatever experience he may have gained

13    with that, had he, in fact, gained much in the way of

14    experience might the fact that the endeavor which brings us

15    here, but certainly I accept the fact and representation

16    that ab initio the purchase was for legitimate purchase.

17              Mr. Gilbert, does that all satisfactorily resolve

18    your objections?  If not, let me know.

19              MR. GILBERT:  There is 53, Your Honor.

20              THE COURT:  I'm sorry.  Okay.  I'm going to

21    accept the accuracy of that --

22              MR. GILBERT:  That would then --

23              THE COURT:  -- representation.

24              MR. GILBERT:  That would then conclude our

25    objections.
```

1        MR. HERDMAN:  If I may interject, I was playing

2   catch up there, I apologize.  With respect to paragraph 23,

3   I did just want to point out that the defendants, in their

4   plea agreement, conceded with respect to the facts that

5   they did receive firearms instructions on July 4th, 2004

6   from Darren Griffin.

7        THE COURT:  Well, if that's in the agreement,

8   then that's binding and I can't change it.  I will abide by

9   whatever the agreement says.  And my recollection, and

10  there was a fair amount at trial about that was that they

11  certainly didn't, you know -- I don't think there were any

12  weapons displayed.

13       MR. HERDMAN:  It was much more nuance

14  instruction, Your Honor, and I can explain that if --

15       MR. GILBERT:  It depends how you define

16  instruction.

17       MR. SLADE:  Your Honor, I think you're right that

18  the entirety of the conversation that the government's

19  talking about, we're talking about, and you're talking

20  about was viewed during the Amawi trial a number of times,

21  so I think everybody knows what was said and what wasn't

22  said during that conversation.

23       THE COURT:  I'll tell you what, I'm going to

24  interpret the parties' agreement as binding me to the

25  evidence that was produced in that regard with the Amawi

1   trial.

2           MR. GILBERT:  Thank you.

3           THE COURT:  Mr. Herdman and Mr. Gilbert, does

4   that resolve the objections, and does it do so in a way

5   that is satisfactory to both of you?

6           MR. GILBERT:  Yes, Your Honor, from the

7   standpoint of Mr. Zubair Ahmed.

8           MR. HERDMAN:  And same here.

9           THE COURT:  And Mr. Slade, likewise, and

10  Mr. Herdman, with regard to the objections on behalf of

11  Khaleel Ahmed?

12          MR. SLADE:  We're prepared for sentencing, yes.

13          THE COURT:  But you're content with my resolution

14  of the objections?

15          MR. SLADE:  We are.

16          THE COURT:  Mr. Herdman?

17          MR. HERDMAN:  Yes, Your Honor, given the

18  clarification.  Thank you.

19          THE COURT:  Okay.  Let's hear from Mr. Herdman

20  first with regard to Zubair Ahmed.

21          MR. HERDMAN:  Your Honor, do you want to handle

22  the government's motions at this point in time, or do you

23  want to wait until --

24          THE COURT:  I think so.  I mean, at least in

25  terms of the 5(K) motion, I think it's appropriate to be

```
 1    made now.  It's my practice, any dismissal motions in the
 2    indictment or whatever come at the end after sentence has
 3    been pronounced.
 4             MR. HERDMAN:  With respect to Zubair Ahmed, Your
 5    Honor, the government is prepared, and does at this point
 6    in time, move under U.S. Sentencing Guideline 5(K) for a
 7    departure of 13 levels off the -- in accordance with the
 8    plea agreement.  So that would bring the offense level down
 9    to a 27.  And government would also move at this point in
10    time under the guidelines with respect to acceptance of
11    responsibility and acknowledge Zubair Ahmed's acceptance of
12    responsibility.
13             THE COURT:  I don't think Mr. -- excuse me, and
14    of course that motion will be granted.  And I don't think
15    that I -- I certainly should, that on granting of that
16    motion, that results in a total offense level of 24,
17    criminal history category of 6; is that correct?
18             MR. HERDMAN:  Yes, Your Honor.
19             THE COURT:  And that results in a guideline range
20    of about 100 to 125 months; is that correct?
21             MR. HERDMAN:  Yes.
22             MR. GILBERT:  That's correct.
23             THE COURT:  Give me one second.  Okay.
24    Mr. Herdman --
25             MR. HERDMAN:  Your Honor, the government is
```

1    recommending and requesting a sentence of 120 months

2    imprisonment as to Zubair Ahmed.  And much of what I have

3    to say goes to both defendants, but in terms of the conduct

4    in this case, which is really government's position --

5              THE COURT:  And let me just, before you go any

6    further, let me just -- I apologize for interrupting, but I

7    just want the record to be clear that there is nothing in

8    the plea agreement that restricts your ability to make

9    whatever recommendation you want to, provided it is within

10   the guideline range.

11             MR. HERDMAN:  That's correct, Your Honor.

12             THE COURT:  Mr. Gilbert; is that correct?

13             MR. GILBERT:  That is correct.

14             THE COURT:  Which is no breach of the agreement

15   that's occurring because the government is not remaining

16   silent.

17             MR. GILBERT:  We agree.

18             THE COURT:  Okay.  Go ahead.

19             MR. HERDMAN:  The nature and circumstance of the

20   offense in this case are of the highest severity, Your

21   Honor.  As the plea agreement sets out, as the facts that

22   were stipulated to both parties in the agreement sets out,

23   these defendants, and especially Zubair Ahmed, over the

24   course of years, this was not a case where it was, I know

25   it's been tried, defense counsel at times characterized it

```
 1    as sort of a fleeing decision to travel overseas or a

 2    one --

 3              THE COURT:  Yeah, but it was a very deliberate

 4    decision.  And the objective of what but for the

 5    interception by Mr. El-Hindi and the father of one of the

 6    defendants in Cairo would have been accomplished.

 7              MR. HERDMAN:  Yes, Your Honor.  I don't want to

 8    go too far --

 9              THE COURT:  Who knows what would have happened

10    after that.  But on the other hand, the venture would have

11    continued.

12              MR. HERDMAN:  Yes.

13              THE COURT:  And it was a venture that obviously

14    had a dangerous and deadly --

15              MR. HERDMAN:  Yes.

16              THE COURT:  And it was a venture that was

17    deliberately undertaken.

18              MR. HERDMAN:  And the intent was to kill members

19    of the United States military.

20              THE COURT:  I think that's undisputed.

21              MR. HERDMAN:  And as you correctly pointed out,

22    this was a decision to travel overseas that did not just

23    arise instantly.  It required planning.  And it required

24    discussions.

25              THE COURT:  And also it is not one to which
```

```
 1    either defendant can point and say take Darren Griffin out

 2    of it and there's no -- as Mr. Hartman said on behalf of

 3    his client.

 4             MR. HERDMAN:  That's exactly right.  These

 5    defendants independently came to this decision.  Marwan

 6    El-Hindi went over in Cairo, brought them back to the

 7    United States, and instead of giving up on this ambition to

 8    engage in violent Jihad against members of the U.S.

 9    military, these defendants went and met with Darren

10    Griffin, a self-avowed extremist, a former member of the

11    U.S. military who did provide firearms instruction on

12    July 4th.  And it was very nuance, as I said, but I think

13    it's important that The Court take that into account

14    because in that July 4th conversation, Darren Griffin told

15    Zubair and Khaleel Ahmed that they should start training

16    with a .22 caliber handgun, that's how they should begin

17    their training.  That was July 4th, 2004, Your Honor.  18

18    months later in February of 2006, Zubair Ahmed and Khaleel

19    Ahmed discuss the fact that Darren Griffin had brought up

20    the .22 caliber handgun when they were discussing amongst

21    themselves what handgun they should purchase.  And Zubair

22    Ahmed is the one who recollected the fact that Darren

23    Griffin had told them to start off with a .22 caliber

24    handgun.  So that -- the reason the government felt it was

25    so important to point out there was instruction provided to
```

1    the defendants on July 4th because that, in fact, kept it

2    in the recesses of their mind and pulled it out at a very

3    crucial moment.  And the date of that telephone, Your

4    Honor, was actually the same date that in Toledo Marwan

5    El-Hindi was being arrested.  The defendants did not know

6    at that point in time he was being arrested.  It was

7    coincidence, but that's the same day that they discussed

8    it.  After the arrest of Marwan El-Hindi, obviously the

9    defendants changed at least the overt acts they were taking

10   with respect to violent Jihad.

11          But to get back to the July 4th meeting, it was

12   important, and I think the government would have to concede

13   on some level that the defendants didn't meet up with

14   Darren Griffin, and they didn't continue their discussions

15   with Marwan El-Hindi.  And the government's position is

16   that they did that because the only people they could trust

17   were each other, and to some extent Syed Haris Ahmed, who

18   was down in Atlanta.  And that gives rise to the reason why

19   these defendants are being charged in a separate case.  It

20   was very apparent as we, the government, reviewed the

21   evidence that you've considered in the Amawi trial, that

22   these defendants were separate conspirators.

23          THE COURT:  There was a linkage.

24          MR. HERDMAN:  Two separate conspiracies that

25   touched maybe over a period of time, but the defendants

1   went on in their own separate conspiracy, and they did not

2   give up this Jihadist ambition.  Zubair Ahmed, as you may

3   recall from the July 4th meeting with Darren Griffin,

4   discussed a five-year plan, and that's set out in the

5   indictment.  But this five-year plan encompassed a number

6   of different steps that would have to be taken.

7   Culmination of a five-year plan was to engage in violent

8   Jihad overseas, at least go overseas and put themselves in

9   a position where they could realize these violent Jihad.

10  The interaction with Syed Haris Ahmed is pointed out in the

11  plea agreement and is very crucial with respect to the fact

12  that these defendants -- Zubair Ahmed was the defendant who

13  had the most contact with Syed Hair Ahmed -- but these

14  defendants sought out, like, younger individuals, in fact,

15  who were putting themselves in position to go overseas and

16  engage in the exact same type of activities that the

17  defendants wished to engage in.  And Zubair Ahmed's

18  interaction with Syed Haris Ahmed was quite extensive, and

19  it lasted at least up until the arrest of Marwan El-Hindi,

20  and probably a little bit after that as well.

21         Syed Ahmed was arrested in the spring of 2006

22  following the arrest in the Amawi case.  But this was over

23  the course of several years Zubair Ahmed cultivated this

24  relationship with Syed Haris Ahmed.  And the whole purpose

25  of it was to go overseas and to engage in violent actions

1    against members of the U.S. military or to engage in Jihad.

2         I did want to just briefly address this purchase

3    of the handgun in the fall of 2006.  As the plea agreement

4    makes clear, defendants, throughout the course of the

5    conspiracy, used code words.  They frequently spoke in a

6    foreign language, Urdu, which is a less commonly spoken

7    language, and they did that with the intent to evade

8    government surveillance.  And the handgun, I will concede,

9    could have had some legitimate purpose to it; however,

10   these defendants discussed that handgun purchase using code

11   words.  And there may be legitimate purposes just like

12   there may be legitimate purposes for going to the shooting

13   range, but I would submit all this activity was geared,

14   even after the arrest of Marwan El-Hindi, all of it was

15   geared toward the possibility of fulfilling this conspiracy

16   that these 12 defendants had arrived at together, which was

17   to go overseas and kill members of the U.S. military.

18        And finally, as the sentencing memorandum makes

19   clear upon the arrest of Zubair Ahmed -- I'm sorry,

20   February of 2007, there was an external hard drive that was

21   seized that contained a number of manuals that related to

22   small arms, weaponry, videos that related to Jihadist

23   attacks as well as some literature on Jihad, some

24   ideological prospectives with Jihad, all of which would be

25   important, all of which were in this external portable hard

```
 1   drive.

 2           So to get back to the nature and circumstances

 3   with which I think is where this is, where the government's

 4   argument essentially lies, Your Honor, is that this is the

 5   highest severity.  These were defendants who agreed and

 6   over the course of several years set out to go overseas and

 7   kill members of the U.S. military.  That was their intent.

 8   That was their objective.  Defense counsel in their

 9   sentencing memorandum, as I read them, tried to compare

10   this case to that of Wassim Masloum.  I'm sure that you

11   read that.  And I can understand why they did that.

12           THE COURT:  I will hear from them, but I

13   understand what you're saying.  I intend to go -- on that.

14   But Masloum was obviously the least engaged and did the

15   most kind of wonder away, and so far, as anybody knows, had

16   nothing to do with -- anything to do with whatever may have

17   been on his mind.  There was communication with

18   Mr. Griffin, Mr. Amawi and Mr. El-Hindi.  I can't remember

19   if he was with all three.  I just don't recall.  The

20   impression I got from Mr. Masloum is he went about the

21   business of selling cars and going to school.

22           MR. HERDMAN:  That's correct.  And I --

23           THE COURT:  So far as we know.

24           MR. HERDMAN:  I don't want to rehash all of the

25   Masloum argument, but generally what I would say is this,
```

```
 1   and I think that, Your Honor, when you actually

 2   sentenced --

 3            THE COURT:  Time out.  I can see a similarity

 4   vis-a-vis meeting in Cleveland and then Griffin kept

 5   saying, well, what about the boys in Chicago, we've got to

 6   get in touch with them.  Nothing happened.  But quite

 7   candidly at this point, that's the extent of any

 8   similarity.

 9            MR. HERDMAN:  What I was going to say, Your

10   Honor, is during the sentencing of Mr. Mazloum, I think you

11   pointed out to the fact, which is in stark contrast to what

12   these defendants did, the way you put it -- if you'll give

13   me just a moment I want to read this into the record --

14   that with respect to Mr. Masloum and his activity, you said

15   just as quickly and brilliantly as that flame flared up, I

16   truly believed that it was extinguished or certainly

17   flickered and has flared out.  And without making any

18   concessions as to whether or not that is the case with

19   Masloum or that's the government's position with Masloum, I

20   think these defendants are in stark contrast to that

21   statement that you made about Mr. Masloum -- Mr. Masloum's

22   activity in that other conspiracy --

23            THE COURT:  Things continue to glow.

24            MR. HERDMAN:  Yes, the ambers were more than

25   ambers, it was a flame and it burned for several years with
```

1    respect to Zubair and Khaleel Ahmed.

2           The other point I wanted to make with respect to

3    Mr. Masloum, this is a more subtle point.  He is not a U.S.

4    citizen, and I know that was a factor that you considered

5    in sentencing Mr. Masloum.  Both of these defendants are

6    citizens.  Overall, that is an entirely separate case and

7    entirely different conduct.  As similar as they may be, I

8    think, as you pointed out, the closest interaction is the

9    extent of the interaction with Darren Griffin.  But with

10   respect to the planning that these defendants did and the

11   conspiracy that existed between these two defendants, it's

12   an entirely different matter, I would submit.

13          And the plea agreements also set out, Your Honor,

14   that there is -- Zubair Ahmed is at a different level with

15   respect to his offense conduct.  He's at a 24 as opposed to

16   Ahmed's at a 34.  And that is just another factor that I

17   think goes into this and into the sentencing decision on

18   what to make.

19          However, the primary factor is the nature and

20   circumstances of the offense.  Zubair Ahmed is obviously a

21   very capable individual.  He's attended numerous

22   educational instructions.  He had a number of options and

23   opportunities available to him, and the one he elected and

24   felt compelled to engage in is Jihad as opposed to

25   legitimate business opportunities.  He wanted to engage in

1   violent Jihad overseas and kill members of the U.S.

2   military.  For that reason I realize that the guideline

3   range we're working with here is a difference of about 25

4   months from the lowest end to the highest end.  But based

5   on the severity of the conduct, based on the opportunities

6   that were given to this defendant throughout his life and I

7   think all of the materials that have been submitted to The

8   Court would suggest that this was a person who had

9   significant opportunity, the choice that he made and the

10  crime that he committed, all of them lean themselves of a

11  recommendation of 121 months in this particular sentence.

12          THE COURT:  Mr. Gilbert?

13          MR. GILBERT:  Your Honor, obviously we have a

14  number of areas to go into today.  First of all, I want to

15  indicate to The Court that Zubair's family is here today.

16  His father, his mother, his sister Jasmine, who just

17  graduated from medical school in Europe, his younger sister

18  Sammy.  They have been staunch, emotional and physical

19  support for him from day one in this process.

20          This process, as you indicated, has gone on for

21  three years, over three years actually.  And I remember the

22  first time we met in this courtroom.  There was somewhat of

23  a contentious debate over whether or not these two young

24  men would be released on bond.  The Court was able to see

25  the roots that my client has in the community of Chicago,

1   not only in terms of his family but extended family,

2   friends, his educational activities, his work history, et

3   cetera.  You took a gamble back then as far as in a case of

4   this nature which, you know, creates a lot of emotion in

5   the community and the public at large.  You took a gamble

6   on allowing them to be released on home detention.  And

7   that gamble proved that what you had hoped would occur in

8   terms of their allegiance and accommodating the probation

9   pretrial services, et cetera, that it wasn't -- it could

10  have been easier just to put them in pretrial detention.

11  But they continued, my client continued to look forward and

12  not backward.  He just didn't waste his time sitting in a

13  house.  He continued his education, continued to help

14  around with his family, provide the support for his mother,

15  and worked on a masters degree all this time, and actually

16  hoped to have been married by this point, but he -- and

17  that's why he stayed out, by the way, Your Honor, and

18  didn't self surrender earlier.  He could have had a

19  significant period of time behind him.

20          THE COURT:  I understand that.

21          MR. GILBERT:  So I wanted The Court to know that.

22  We would ask The Court to impose the minimum.  I'm sure

23  that's not a surprise to you.  We really feel that that is

24  more than adequate to serve the principles and philosophy

25  of sentencing in this case.  We know there are no criminal

1    history points here, but for this unfortunate series of

2    acts and circumstances.  Here was a young man who

3    exemplified good behavior in the community.  And I don't

4    want to dwell on all the facts of the case, and I certainly

5    don't want to throw up a defense at this point to his

6    behavior.  He has pled guilty, acknowledged his role.  You

7    read the statement that he gave to the probation officer

8    where essentially he has come to grips with the fact that

9    his thinking process in the years 2004, 2005 and going into

10   2006, was completely wrong, full hearted, distorted.  And

11   if there was anything that he could do more to show his

12   regret and remorse and to atone for what he did back then,

13   he would do it.  There's nothing more that he can do to

14   demonstrate to The Court more than what he's already done.

15          You know, I know the government's position in

16   here was this was a dangerous, well-thought-out conspiracy,

17   that had it continued would have caused unknown harm and

18   perhaps death to American soldiers.  And certainly that was

19   the intent.  I don't dispute that for one moment.  But the

20   plan is different than the intent, and the actions, while

21   indicative of the intent, did not play out in a way that

22   was sophisticated or developed to an extent that it might

23   have gone the way the government thought it would go.  I

24   mean, you have -- you have a couple of young guys here who

25   basically bought into this idea of Jihad because of their

```
 1    naivety.  You've got to remember, 2003, 2004 is not today
 2    in 2010.  They are not the same people.  They were
 3    youngsters back then, essentially.  They started
 4    legitimately studying Islam to further their knowledge of
 5    their religion, and they were not raised this way.  They
 6    came from families that bought into the American dream who
 7    gave their --
 8         THE COURT:  And have, if I understand correctly,
 9    otherwise prospered in various ways.
10         MR. GILBERT:  Prospered.  The father and the
11    mother came over from India and Pakistan with nothing,
12    working jobs, selling hot dogs on the street, building up
13    some money to eventually get into a business, finishing the
14    education.  This is the kind of values they instilled on
15    Zubair.  And Zubair essentially took up that call and went
16    to school.  He went to a catholic school.  He went to
17    various colleges, he worked.  There is more to him than the
18    indictment or the information or the presentence report
19    account of what he did.
20         THE COURT:  Yes, but of course it's that aspect
21    of him that brings us here.  I understand.
22         MR. GILBERT:  That's right.  So I guess what
23    we're arguing about here, or not arguing but --
24         THE COURT:  No, what you're --
25         MR. GILBERT:  -- discussing.
```

1         THE COURT:  One is trying to push me up and the

2    other is trying to pull me down in terms of the range.  I

3    understand.

4         MR. GILBERT:  They decide, okay, we're going to

5    go to Egypt, and maybe we'll find somebody that will help

6    us get into Pakistan.  I mean, they had no contacts with

7    any organization or any specific individual who was a

8    member of an insurgent group or terrorist organization.

9         THE COURT:  A little like me going to Belfast and

10   raising my hand or going to London and raising my hand for

11   a trip to --

12        MR. GILBERT:  They go to a travel agency, they

13   buy tickets, and they hide this from their parents, and the

14   day after they wound up not being at home, their mother's

15   on the phone.  They go to the Chicago Police Department and

16   enter a missing person's report.  They're still under the

17   auspices of their parents at this stage.  And of course

18   because of this family integrity, it didn't take long to

19   find them.  It didn't take long to find out that they were

20   halfway around the world in a city of multi-millions of

21   people and find them within a few days.  And on one hand

22   you could say, well, but for that, you know, ability to get

23   them out, they would have continued.  Who knows where they

24   would have gone.  But it was a far cry from Islamabad or

25   the western region of Pakistan.  I mean, to get to a

1   terrorist camp and all that, I mean, we can argue back and

2   forth how possible that would have been, but nonetheless,

3   that was their intent.  There's no question about it.  But

4   it was an ill-conceived venture.  And they did not put up a

5   fight when Mr. Ahmed showed up with Marwan El-Hindi and

6   Youseff, the one that came from the medical school in

7   Slovakia.  They spent the next week or so touring -- as

8   tourists riding camels.  We have pictures of that and that

9   kind of thing, and then they came home.  And you know,

10  unfortunately they should have just stopped right there.

11  You know what I mean?  If we had our way about it looking

12  back, that's what we would have hoped they have done.

13          But I just want to make a comment on the

14  July 4th ICNA conference.  As far as I understand, they

15  went to this conference to promote the medical school in

16  Slovakia that Marwan's brother was sponsoring and trying to

17  recruit students.  This is -- this ICNA conference was a

18  public conference, open, not some secret meeting.

19          THE COURT:  It wasn't the cell?

20          MR. GILBERT:  It wasn't the cell in some safe

21  house.  They -- they were there for the legitimate purpose.

22  Mr. Herdman, you know, kind of made it look like they went

23  there to meet with the trainer.  The trainer idea came

24  about as they were in the process of going or getting

25  there.  And in fact, they didn't meet him the first day.

```
 1     They actually met him in an innocuous meeting, and then it
 2     wasn't until I think the day afterwards that they actually
 3     had this 20-minute conversation about training, and you
 4     know the details.
 5               THE COURT:  Sure, I saw the pictures.
 6               MR. GILBERT:  And beyond that, beyond that trip
 7     to Egypt, nothing really materialized in terms of actual
 8     acts other than communication from that point on.  It was
 9     either all Internet interactions with each other, phone
10     conversations with each other and Internet and phone --
11     Internet actions with Syed Haris who wanted Zubair and
12     Khaleel, I guess, to go meet him either in Georgia.  And
13     Syed Haris went off and did all kinds of bad things during
14     that period, but Zubair never joined him.  It was just
15     talk, and there was a lot of talk about many things that
16     young people talk about, family, education, games, things
17     like that.  I mean, it wasn't just only during that period
18     about, you know, Jihad.  And yes, there was talk about a
19     five-year plan.  But when you look at this case, the
20     totality of the circumstances, you have a period of time
21     where there were multiple interests that Zubair had, one of
22     which was the idea of engaging in Jihad, but it never got
23     too far.
24               And, you know, as a defense lawyer, I look at the
25     guidelines, I look at these numbers, and I see they're just
```

```
 1    off the charts.  And when you really look at this
 2    individual and see that at this point in life, the
 3    opportunities and the potential that he has, how much
 4    punishment is really needed to do the things that are
 5    necessary to satisfy the purposes of sentencing as well as
 6    to give them a chance to be a productive member of society.
 7    He did get one point more than Khaleel, and I actually
 8    think that the two of them were in this together for the
 9    most part.  As cousins they've known each other, or just
10    that Zubair has better command of the language, has more
11    education.
12              THE COURT:  Actually, they became acquainted at a
13    wedding or something.
14              MR. GILBERT:  Pardon?
15              THE COURT:  I thought they had become acquainted
16    at a wedding.  In other words, they hadn't really known
17    each other on a life-long basis, am I wrong about that?
18              MR. SLADE:  Your Honor, they had met once at a
19    family wedding prior to Khaleel's arrival in the U.S.
20              THE COURT:  Right.
21              MR. GILBERT:  But what I mean in the relative
22    time period, they were very close.
23              THE COURT:  I understand.
24              MR. GILBERT:  And I think they were in this
25    together.  The government wanted to have Zubair to have an
```

```
 1    extra point, and obviously we didn't object to it.  But I
 2    think extra point more than adequately suffices and
 3    substantiates a low -- the lowest range because he is
 4    getting more time than Khaleel.  But in truth, and I'm not
 5    saying this to any way suggest that Khaleel should get more
 6    time, but I just think that Zubair is taking a burden on a
 7    debatable point.  I mean, he really was more communicative,
 8    but in terms of actions, I don't think they would even
 9    disagree that they were in this together.  And that's an
10    eight-month bump, Your Honor, between Zubair and Khaleel in
11    terms of the minimum.  I believe Khaleel's getting a 92
12    month minimum possibility, and Zubair's at 100 month
13    minimum possibility.  And I just think that when the
14    government, we negotiated this plea agreement over a long
15    period of time.  It was a very difficult process to get to
16    where we're at today.  And we were hoping, frankly, that we
17    wouldn't have to go through a sentencing hearing like we
18    are today, that the government would simply say, well, you
19    know, we are willing to go to -- agree to 100 -- to 125
20    range, given the 5(K)1, given all the things that he's
21    done, you know, the proffers, et cetera, no record,
22    circumstances of the case kind of being somewhat out of the
23    heartland of normal terrorist cases that we see, that they
24    would just simply say we'll go along with 100.  Obviously
25    they can't object to this if it's the 100 months.  But we
```

```
 1    would ask The Court, because of the things that we've said,
 2    to impose a 100 month sentence.  That's a long period of
 3    time for a young man of his age.  He'll be close --
 4    probably be close to 40 when he gets out.  He -- every
 5    month would make a big difference, and it seems to me that
 6    it would be appropriate under the circumstances given the
 7    totality of the situation here to give him 100 months as
 8    the sentence.  I think that would be more than sufficient.
 9    Thank you.
10          THE COURT:  Mr. Ahmed, you may speak on your own
11    behalf before I pronounce sentence.
12          ZUBAIR AHMED:  Your Honor, I'd like to, first of
13    all, thank you for letting me speak on my own behalf,
14    though my lawyers were speaking on my behalf, but currently
15    I'm just speaking to you face-to-face.  I'd like to start
16    off by apologizing for my previous ambitions -- my actions,
17    which were totally wrong.  The thing was that I was caught
18    up in the world events, and what I was thinking at the time
19    was that the path to violence would somehow help my nation,
20    which is the Muslims, from getting their freedoms stripped.
21    I thought by getting caught up in the violent idealogy
22    would somehow gain beneficial gains, but if we look at
23    history, very recently we see Hamed Hacbani (phonetic)
24    practiced non-violence, and his whole movement was founded
25    on non-violence and we see the fruits of that today.  What
```

1     we see today is India, which is a viable democracy.  I

2     believe it's the world's largest -- we see a multitude of

3     cultures and religions there, and everybody gets to

4     practice their religion, and people are basically living in

5     piece.  And he did it through non-violence, and it

6     accomplished a lot.  And that's a good example for me to

7     follow.  And I was thinking about that while under house

8     arrest and while this whole case was unfolding.

9          And another thing I'd like to say is that, I

10    mean, my actions did produce a lot of harm for my family.

11    They're the only ones right now that are there for me, and

12    the fact that I'm not physically there for them and that,

13    you know, that hurts them, and it's going to continue to

14    hurt because of my actions, which I shouldn't have done.

15         And as I heard him say, I did have opportunities

16    which I did engage in.  I was better off, I was from middle

17    class family, I had educational better, I did choose a

18    different path which I shouldn't have chosen.  Currently I

19    have no Jihad mission, nor will I in the future, and that

20    is not the case now.

21         Another thing is a year after I came back from

22    Egypt I met my fiancee, and she's still there for me in a

23    sense that I couldn't get married due to a myriad of

24    reasons which I'm not going to bring up in court, but she's

25    still there, and she said she's going to wait for me when I

1   get out and we are corresponding with each other.  And

2   unfortunately she didn't know -- I mean, well, fortunately

3   she didn't know about my previous ambition, but what

4   happened was my past caught up with me, and when I got

5   arrested she just got thrown into that, what I would say

6   holding a pot of water.  And she too had to suffer because

7   of my previous actions.  And I think that's totally unfair.

8   And I told her to leave me, and you didn't know about this,

9   but I'm done with that.  I want to marry you and have a

10  family, and I was quite candid in that.  But despite that

11  fact, she still has decided to stand by me, and I owe it to

12  her too to be a model citizen, to give back to the United

13  States of America to be a good citizen and by completely

14  abolishing any type of violent idealogy, bringing harm to

15  any citizen or any U.S. service men or any human being.

16          I mean, there are a lot of aspects which I can't

17  continue to follow which have nothing to do with violence.

18  There's, for a whole multitude of things I can do, and I

19  did pick up these things while under house arrest.  I've

20  been working with other individuals, while I'm in prison

21  I'm going to continue to follow that work, which is

22  basically give no harm to any human being, and basically

23  all governments will be happy.  Also my choice that I made

24  previously would have put myself into direct conflict with

25  U.S. traps which is completely wrong, and that's something

1   that would hurt my fellow countrymen.  At that time I was
2   looking at U.S. troops as my enemy but I shouldn't have.
3   You know, they were also my country.  And I can still be a
4   Muslim and an American citizen simultaneously.  At that
5   point I thought there's only one thing I can be, a Muslim.
6   And like Busch said, you are with us or against us.  At
7   that point I was, like, man, I'm with them but now it's not
8   that case.  I had, like my counsel said, I was more naive.
9   At that point I thought that a lot of things would be
10  happening because of the violence that would culminate into
11  more positive things for Muslim people.  But exact opposite
12  of that happened.  There's just more violence, more hate,
13  and basically no issues are being resolved both on the
14  American side and Muslim side.
15          So regarding that, I think that's all I have to
16  say.  Once again, I'd like to apologize for my actions.
17  I'd like to thank the government for working with counsel
18  and to coming up with this range.  And I'd like to
19  apologize to my family, the American government, the
20  American people and the U.S. service men.  And I'd like to
21  thank you for listening to my statement.
22          THE COURT:  Mr. Herdman, anything further?
23          MR. HERDMAN:  I'm sorry, Your Honor?
24          THE COURT:  Anything further from the government?
25          MR. HERDMAN:  No.  I'm comfortable resting on my

1   previous statement.

2          THE COURT:  Mr. Gilbert, anything further on

3   behalf of your client?

4          MR. GILBERT:  Your Honor, did you want to have a

5   side bar on the other memo that we filed regarding the

6   5(K)1, or did you hear enough?

7          THE COURT:  I'm quite comfortable.

8          MR. GILBERT:  Okay.  Thank you.

9          THE COURT:  It's not my practice to put anything

10  of that regard on the record.  And I think I've been

11  adequately informed throughout the course of these

12  proceedings.  I think I was made aware fairly early on of

13  what some of the activities were that were contemplated and

14  the extent to which they've been carried out.  I'm going to

15  accept the government's recommendation, and I'll explain

16  why shortly.

17         Formally to pronounce sentence, pursuant to the

18  Sentencing Reform Act of 1984 and 18 U.S. Code, Section

19  3553(A), it's the judgment of this court that defendant,

20  Zubair Ahmed, be and hereby is committed to the custody of

21  the bureau of prisons to be in prison for a term of 120

22  months.  Upon release from imprisonment, defendant shall be

23  placed on supervised release for three years which is the

24  maximum term.  Within 72 hours of release from the custody

25  of the Bureau of Prisons, you shall report in person to

1    United States pretrial service and probation office in this

2    district or in the district in which he is released.  No

3    fine will be imposed.  There will be a special assessment

4    of $100 which is due immediately.  That's payable -- does

5    he have that money, the special assessment?  If not it will

6    be taken from his prison earnings, or if the family can pay

7    for it, that's fine.

8              While on supervised release, the defendant shall

9    not commit another federal, state or local crime, shall not

10   illegally possess a controlled substance, shall comply with

11   the standard conditions adopted by this Court and following

12   any additional conditions.  There's no substance abuse

13   background, is there?

14             MR. GILBERT:  No.

15             THE COURT:  Okay.  I will waive the drug testing

16   requirement.  And that's not part of the plea agreement, I

17   take it?

18             MR. GILBERT:  No.

19             THE COURT:  Defendant shall not possess a

20   firearm, destructive device or dangerous weapon.  He shall

21   submit his person, residence, place of business, computer,

22   vehicle to a warrantless search, conducted and controlled

23   by the U.S. probation officer at a reasonable time and in a

24   reasonable manner based on reasonable suspicion of

25   contraband.  Evidence of failure to submit to such a search

 1   will be grounds for revocation.  The defendant shall inform
 2   any other residents that the premises may be subject to
 3   search pursuant to this provision and shall provide the
 4   probation officer with access to any and all requested
 5   financial information, shall undertake diligently to seek,
 6   and if he seeks to diligently maintain lawful, gainful
 7   employment.  He shall cooperate in the collection of DNA as
 8   directed by the probation office.  Does any party have any
 9   objection to any part of these proceedings that's not
10   previously been made?
11           MR. HERDMAN:  Not from the government.
12           MR. GILBERT:  Your Honor, I had neglected to make
13   this request in our sentencing memorandum.  We had asked
14   that The Court to recommend Oxford Correctional Facility or
15   Institution in Wisconsin.
16           THE COURT:  I'll make that recommendation.
17           MR. GILBERT:  And there's a medium security
18   prison there because it has educational opportunities so on
19   and so forth.
20           THE COURT:  As you're well aware, I have no
21   control or ultimately even influence over those decisions,
22   it's entirely up to the Bureau of Prisons.  It would be my
23   anticipation or hunch that given the label that's attached
24   to the conviction and enhancement and criminal history
25   category that flows from all that, that may not be likely,

1    but I certainly will recommend it.  It makes good sense.

2              MR. HERDMAN:  I just want to point out the

3    government has agreed in the plea agreement that we will

4    not contest whatever requests by defense counsel with

5    respect to the location of the incarceration.

6              THE COURT:  I assume the bond was discharged,

7    right?

8              MR. HERDMAN:  It just was.

9              MR. GILBERT:  It just was.  And Judge, if you can

10   put into the recommendation Oxford or an institution as

11   close to Chicago --

12             THE COURT:  As close to Chicago as possible.

13             MR. GILBERT:  -- as possible.

14             THE COURT:  Absolutely.  I agree.  I have no

15   problem with that at all.  The idea of sending somebody

16   2,000, 3,000 miles away from his family makes no sense.

17   But as I say, that's the Bureau of Prisons.

18             Mr. Ahmed, although I assume that the plea

19   agreement -- I know the plea agreement waives any right

20   that you might otherwise have to appeal; nonetheless, I

21   have to inform you that to the extent you may have a right

22   to appeal in order to preserve and protect that right, you

23   must file a notice of appeal within ten days of the entry

24   by me, my judgment, which will occur sometime later today.

25   If you fail to file a timely notice of appeal, you will

1  lose forever whatever rights you might otherwise have had

2  to challenge your conviction or sentence by way of direct

3  appeal, post conviction relief, habeas corpus or otherwise,

4  do you understand that?  You do not.  Okay.  I can explain

5  it.  The plea agreement -- the plea agreement if I --

6          THE DEFENDANT:  I understand, sir.

7          THE COURT:  Counsel will tell me you have waived

8  the right to appeal except that does that include an

9  exception for imposing a sentence in excess of the

10 statutory maximum?

11         MR. HERDMAN:  Yes, Your Honor, or outside the

12 agreed to --

13         THE COURT:  Outside -- so as a practical matter,

14 you probably, in all likelihood, do not have a right to

15 appeal; however, if you do, you must exercise that right

16 within ten days or you will lose it forever.

17         THE DEFENDANT:  I understand.

18         THE COURT:  To pronounce my reasons under section

19 3553(A) and the guidelines, obviously extremely serious

20 offense.  The government has said it all in that regard.  I

21 believe that the sentence will promote respect for the law.

22 I believe that under all circumstances, the sentence is

23 just.  It does take into account the cooperation and the

24 assistance that the defendant provided following his arrest

25 and charge in this case.  I hope that it affords

1    sufficiently adequate deterrent of you, Mr. Ahmed.  As to

2    that, only time will tell.  And I certainly hope -- and

3    part of the reason for my accepting the government's

4    representation is to underscore public deterrent effect of

5    the sentence, as I recall expressing, and although the

6    circumstances here are somewhat different, but as I recall

7    expressing at the time, I sentenced the other three

8    defendants and what at one time was a case including you as

9    well, people should be aware that if somebody shows up

10   talking Jihad this and Jihad that, and encouraging people

11   to engage in acts contrary to the interest and the welfare

12   of this country and its citizens and its servicemen, the

13   most sensible thing for anybody who hears that kind of

14   statement and that sort of entreaty is to assume that that

15   individual is working for the United States of America and

16   is not as he purports to be.  And unfortunately,

17   Mr. Mazloum, Mr. Amawi and Mr. El-Hindi did not come to

18   that conclusion.  To some extent, you were exposed to the

19   same thing with Mr. Griffin, and although the link that you

20   had with him and the other three defendants never became a

21   binding chain, nonetheless you did not end in entirely the

22   intentions that took you to Egypt and were encouraged in

23   the conversation that you had on that July 4th long ago.

24   But it is my hope that this sentence, the final analysis

25   serves as a deterrent to others who might be similarly

```
 1    inclined.  The government takes that kind of conduct and

 2    attention very seriously, as it has to.  And to some

 3    extent, I am seeking to have you serve as an example of

 4    what happens when people thoughtlessly and foolishly get

 5    caught up in the kinds of thinking that you did.  I take

 6    you at your word that you have abandoned those thoughts.  I

 7    hope so.  Quite candidly, though, were it within my power

 8    to do so, I would impose a much longer period of supervised

 9    release so that there would be reason for us to be able to

10    ensure that that is the case, but I cannot.  But that is my

11    sentence.  Mr. Herdman, need I say or do anything else

12    before concluding the proceedings as to Mr. Zubair Ahmed?

13              MR. HERDMAN:  No, Your Honor.  I'm satisfied with

14    that.

15              THE COURT:  Mr. Gilbert?

16              MR. GILBERT:  Nothing further.

17              THE COURT:  That will conclude the proceedings as

18    to Mr. Zubair Ahmed.  Mr. Herdman, with regard to

19    Mr. Khaleel Ahmed?

20              MR. HERDMAN:  Your Honor, with respect to Khaleel

21    Ahmed, at the outset I do need to make a motion under

22    section 5(K) of the U.S. Sentencing Guidelines.

23              THE COURT:  Time out.  You also -- are there any

24    dismissals with regard to Mr. Zubair?

25              MR. HERDMAN:  Yes.  I didn't know if you wanted
```

```
1    to do that.

2              THE COURT:  Why don't we do it with regard

3    Mr. Zubair Ahmed.

4              MR. HERDMAN:  With respect to Mr. Zubair Ahmed,

5    the indictment as it -- prior to the superseding

6    information that was filed, indictment as to Mr. Zubair

7    Ahmed has to be dismissed.

8              THE COURT:  A little louder.  It's hard for me to

9    hear.

10             MR. HERDMAN:  I'm sorry.  The indictment as

11   opposed to the superseding information to which Mr. Zubair

12   Ahmed has pled guilty, the indictment should be dismissed

13   at this time, Your Honor.

14             THE COURT:  Okay.

15             MR. GILBERT:  No objection.

16             MR. HERDMAN:  And as to Khaleel Ahmed, the

17   government does have two motions to make.  The first being

18   under Section 5(K) of the U.S. Sentencing Guidelines, and

19   in accordance with the plea agreement that's been entered

20   into by the parties, the government, at this point in time,

21   does move under Section 5(K) for a departure of 12 levels

22   to an offense level of 26.  And the government would also

23   make a separate motion under the guidelines for acceptance

24   of responsibility with respect to this defendant.  And that

25   should put us at an offense level of 23, criminal history
```

```
 1   category six.
 2               THE COURT:  And I think we previously agreed to
 3   that.
 4               MR. SLADE:  Your Honor, that does accurately
 5   state that in the plea agreement.
 6               THE COURT:  Okay.
 7               MR. HERDMAN:  Now I'm not going to go back into
 8   all --
 9               THE COURT:  Give me one second.
10               MR. HERDMAN:  Sure.
11               THE COURT:  Go ahead.  I'm sorry.  I had to check
12   something.
13               MR. HERDMAN:  I don't think I need to go back
14   through all of the --
15               THE COURT:  I would agree.
16               MR. HERDMAN:  But, again, the nature and
17   circumstances of the offense with respect to Khaleel Ahmed,
18   it's the same offense we discussed with respect to Zubair.
19   I just want to point out, though, although there was an
20   enhancement for Zubair Ahmed in the leadership role he
21   took, there's no mitigating factor with respect to Khaleel
22   Ahmed for mitigating the offense.
23               THE COURT:  I understand.
24               MR. HERDMAN:  So I just wanted to point that out
25   to The Court.  And with respect to Khaleel Ahmed, he -- he
```

```
 1   was a lockstep partner, I would say, with Zubair Ahmed.

 2   It's true that Zubair was more communicative, I think is

 3   the way Mr. Gilbert put it; however, Khaleel Ahmed was also

 4   in line with Zubair Ahmed with respect to the ambition that

 5   they shared, with respect to planning that went into the

 6   trip to Egypt, with respect to the discussions at the

 7   July 4th ICNA conference, with respect to all of the

 8   communications with Syed Haris Ahmed.  As I pointed out in

 9   the sentencing memorandum, I think it's very telling that

10   there was a December telephone conversation between Syed

11   Haris Ahmed and Zubair Ahmed at the conclusion of which

12   Zubair Ahmed and Syed Haris Ahmed agreed that they would

13   try to meet up down in Atlanta.  And the first phone call

14   that Zubair Ahmed made after he hung up with Zubair Ahmed

15   was to his cousin Khaleel.  And Khaleel knew who Syed Haris

16   Ahmed was.  He was willing to plan and go down to Atlanta.

17   And in some respects, and this, again's, pointed out in the

18   sentencing memorandum.  In February 2006 there came a point

19   in time where Zubair Ahmed complained that there were

20   obstacles in their path with respect to the -- Jihad.  And

21   Khaleel played a role of advising Zubair Ahmed that this

22   was just another obstacle that's in their path that they

23   have to overcome in order to achieve this objective.  So in

24   a lot of ways, it's -- this conspiracy is a conspiracy of

25   equals, although there was a guideline enhancement for
```

```
 1   Zubair Ahmed.  They were close friends and relatives, and
 2   they were -- they shared the same intent.  They shared the
 3   same objectives, and Khaleel Ahmed was there every step of
 4   the way in this conspiracy with Zubair.  And Khaleel Ahmed,
 5   again, you've seen the materials that have been submitted
 6   by defense counsel, this is a person who had numerous
 7   opportunities.  He held a variety of what appeared to be
 8   well-paying jobs, professional type jobs, and he was also
 9   pursuing an education.  While all of this was going on, he
10   still harbored this desire to go overseas and to kill
11   United States military, to engage in violent Jihad
12   overseas.  Yes, it's true that this was one part of his
13   life, but all of these other parts of his life and part of
14   the five-year plan that the Ahmeds had conceived, was that
15   their entire lives would be devoted to this objective.  So
16   it's natural to conclude that the education, the financial
17   stability that either one had enjoyed, a lot of steps that
18   he was taking in his own personal life, all of those had,
19   at least in the long-term, had some role to play in the
20   defendant's conspiracy to kill members of the U.S. military
21   overseas.  And I should have said this at the outset, the
22   government is respected -- with respect to Khaleel Ahmed a
23   sentence of 108 months.  And the offense that the
24   defendants have already pled to reflects what Mr. Gilbert
25   was trying to say is that this plan, I think I would
```

1   dispute the characterization of it not being serious or not

2   being well thought out, but the street steps they were

3   taking with regard to completion of this plan and the

4   activities that the defendants engaged in, that they have

5   pled to, all of that is reflected in the charge --  they're

6   not pleading to the 956 conspiracy, they're pleading to the

7   conspiracy to commit themselves to engaging in violent

8   Jihad overseas.  Khaleel and his attorneys have also tried

9   to draw comparisons to Wassim Masloum and essentially

10  saying that --

11              THE COURT:  I know.  I understand.

12              MR. HERDMAN:  -- least culpable.

13              THE COURT:  Yep.

14              MR. HERDMAN:  All five defendants, and for the

15  same reasons I outlined with respect to Mr. Zubair, I would

16  just urge The Court to take a little more into -- with

17  respect to those facts.  But I don't feel a need to rehash

18  all the circumstances of these defendants because these

19  defendants engaged in the exact same conduct together.

20  This was a series, as I said, of equals, and Khaleel Ahmed

21  was, along with Zubair Ahmed, planning and perpetrating

22  this conspiracy from a very early age and continued up

23  until the moment of their arrest is the government's

24  position.  And for that reason, the government is

25  recommending a sentence of 108 months.

1           MR. SLADE:  Thank you, Your Honor.  Your Honor,

2    there's no doubt and there's no dispute that in 2004 my

3    client, Khaleel Ahmed, was a confused kid.  He had been in

4    the country just a few years.  He had spent his whole life

5    abroad.  He had a couple of normal years as a young man.

6    But his dad in 2002 had a stroke and Khaleel was forced to

7    give up all of those educational opportunities.  He had to

8    go to work to support his family.  And it was at that point

9    in time that Khaleel got to know his cousin Zubair very

10   well.  Khaleel looked up to Zubair, Your Honor.  He was

11   older, he was a lot more familiar with the U.S. culture.

12   He was a lot more familiar with the Islamic religion, and I

13   think even the government would agree Zubair has a very

14   gregarious big personality.  My client's not like that,

15   Your Honor.  Khaleel is very shy.  He looked up to Zubair.

16   They spent a ton of time together.  And it was in that

17   context that my client made a trip to Egypt in 2004.  And

18   when he went, I agree with Mr. Gilbert, there's no doubt

19   that in their minds they thought we'll go to Egypt and then

20   we'll use it as a spring board to the battlefield in

21   somewhere they didn't really know quite honestly.

22           Now, Mr. Herdman says that but for Mr. El-Hindi

23   and Mohammed Ahmed, there would have been something that

24   would have mattered.  I can't say that would have happened.

25   We'll never know, but let's look at the facts of what

 1   happened.  They were there two or three days before

 2   Mohammed Ahmed and the El-Hindi brothers got there.  What

 3   happened during those two or three days?  Absolutely

 4   nothing.  They were there a week after Mohammed Ahmed and

 5   the El-Hindi brothers got there.  If they really were

 6   serious about this, something would have happened.  What

 7   happened, Your Honor?  Nothing.

 8          Now, it's clear that what they did when -- what

 9   they had in their minds when they went to Egypt was very

10   serious, but I do not think the facts in any way support

11   the government's argument that something serious was going

12   to happen but for the intervention of the El-Hindi brothers

13   and Mohammed -- Your Honor, when they came back to the

14   United States in 2004 they were brought to Cleveland to the

15   ICNA conference.  And Your Honor saw the video many times.

16   That was the only time they ever met Darren Griffin.  The

17   evidence is undisputed that Khaleel, my client, completely

18   blew off Darren Griffin.  Griffin and Mr. El-Hindi made

19   repeated attempts to get my client to join in his cell and

20   my client said I'm too busy.  He blew him off.  And he had

21   an opportunity, as Mr. Herdman said, to join with

22   Mr. El-Hindi and his friends and my client said no.  So

23   Your Honor, it is very serious what he did when he went to

24   Egypt, but in all serious aspects, it ended there.

25          Your Honor, my client has no criminal history, no

1    history of any violence at all.  And Your Honor, my client

2    was out on pretrial release for more than two years and

3    Your Honor didn't hear a single peep from him.  There were

4    no violations whatsoever.  My client accepted

5    responsibility, and he surrendered early.  Khaleel has now

6    served 17 months in a maximum security facility.  He

7    surrendered early to get his sentence started.

8            THE COURT:  Where is he serving his sentence?

9            MR. SLADE:  The MCC of Chicago, they have to be

10   max because he -- and he knew if he was going to surrender

11   early to get the clock started, he knew he was going have

12   to serve harder time than he otherwise would.

13           THE COURT:  Is that a permanent place of

14   designation?

15           MR. SLADE:  No, typically it's pretrial.

16           THE COURT:  Awaiting sentence.

17           MR. SLADE:  I've got some clients who serve the

18   whole time here, but those have been --

19           THE COURT:  Sure.  So, Your Honor, my client

20   accepted responsibility.  He pled guilty and he surrendered

21   early because he wants to get this done.  He does not have

22   these ambitions anymore, and he wants to move on with his

23   life.

24           MR. SLADE:  Your Honor, I want to discuss for a

25   moment, because I think it's really important, the needs of

1    what unwanted sentencing disparities, and I completely

2    disagree with the government's analysis and analogies of

3    this case to the Masloum situation.  Giving my client more

4    time than Mr. Masloum would make absolutely no sense for

5    four reasons.

6            The first reason is, Your Honor, by definition,

7    Mr. Ahmed's crime, Khaleel Ahmed's crime, is less serious

8    than Mr. Masloum's crime.  Mr. Herdman said it himself,

9    what Mr. Masloum was convicted of by a jury of was

10   conspiracy to kill or maim Americans abroad in violation of

11   18 U.S.C. 956(A).  What Khaleel pled guilty to was a less

12   serious crime, conspiracy to provide material support for

13   terrorists, violation of 18 U.S.C. 2335(A).  There's no

14   doubt it's a less serious offense, congress says it's less

15   serious.  The maximum penalty for each is less.  And Your

16   Honor said it was less serious.  In the Amawi case, as you

17   recall, they were all convicted of both charges, both

18   956(A) and 8, but when Your Honor added up the sentencing,

19   you gave less time on Count 2 then you would have for Count

20   A.  By definition, what Mr. Khaleel Ahmed did was less

21   serious than Mr. Masloum, and Mr. Masloum got 100 months.

22   It doesn't make sense for Khaleel to get more.

23           The second reason is, Your Honor, I'm kind of

24   surprised at the government's assertion that what Mr. Ahmed

25   did was more serious than Mr. Masloum because they took the

1    opposite position in their briefing before The Court before

2    the Masloum sentencing.  In that they said things like

3    Mr. Masloum repeatedly asserted himself by offering money,

4    recommending recruits and providing training suggestions,

5    none of that's true of Mr. Khaleel.  They said that Masloum

6    implored Mr. Griffin to accelerate the Jihad training.

7    That's not true of my client.  But the reality is, my

8    client, what he did is significantly less serious than what

9    Mr. Masloum was convicted of by a jury.

10          The third reason that he needs to get less time

11   than Mr. Masloum is just because of the -- it's one simple

12   fact that nobody can dispute, Mr. Griffin recruited

13   Mr. Masloum into a cell.  He asked Mr. Masloum do you want

14   to join my Jihadist cell, Mr. Mazloum said yes.  He asked

15   my client the same question.  Do you want to joint my

16   terrorist cell, and Khaleel said no.  There's no basis to

17   sentence Mr. Khaleel to more time than Mazloum.

18          And the fourth reason, I don't want this to go

19   unnoticed and I kind of fear it is.  Mr. Masloum forced the

20   government to put on a three-month trial.  He didn't accept

21   responsibility, and he's still -- and he's appealing.  He

22   still hasn't accepted responsibility.  My client, Khaleel

23   Ahmed, is sorry for what he did.  He wants to pay his debts

24   to society for what he did.  He pled guilty, accepted

25   responsibility and then cooperated with the government.  It

1   is unbelievably difficult for these guys to cooperate with

2   the government and potentially have to testify as

3   convicted -- as folks convicted of terrorist-related crime.

4   They agreed to do it.  And that is something that

5   completely diverges my client's situation from Mr. Masloum,

6   completely.

7        Mr. Khaleel did, I also don't agree with the

8   characterization that he was lock-stepped with his cousin

9   the entire time.  The evidence doesn't support that at all.

10       Now, I agree with what Mr. Herdman said they had

11  the same intent when they went to Egypt, they did.  They

12  planned together and went to Egypt together.  But my client

13  never spoke to Syed Haris.  He actually -- my client, I

14  think the evidence is, he had one conversation with Syed

15  Haris Ahmed about computer mother boards.

16       THE COURT:  Computer?

17       MR. SLADE:  My client never had any conversations

18  with Syed Haris about Jihad.  There's a ton of instant

19  messages and e-mails with Zubair and Syed.  That's not true

20  of Khaleel at all.  Khaleel never met Syed Haris Ahmed.  So

21  a lot -- pretty much -- I mean everything that happened,

22  there are a few events the government's talking about, a

23  few sporadic contacts, but virtually everything after Egypt

24  with -- we're asking for a period of 92 months.  I think

25  it's hard to justify a longer sentence.  There's no way

1    under all these circumstances that he should get the same

2    or more than Mr. Masloum did, and I think a sentence of 92

3    months is more than sufficient to punish him for what he

4    did, to deter him or others from doing it again, to protect

5    the public and rehabilitate him.

6              As far as protecting the public, Your Honor --

7    Your Honor remembers we had two contested bond hearings

8    when Mr. Khaleel was arrested in February.  He came here in

9    April of 2007.  And the government argued that Khaleel was

10   a flight risk and a danger to the community, and Your Honor

11   disagreed, and he was out on bond.

12             In December of 2007, the government arrested him

13   again, and we came back here again and had another

14   contested bond hearing.  Now, this was not because of

15   anything that Khaleel got wrong because he had been acting

16   like a choir boy while he was on pretrial release.  The

17   government's new allegations in the superseding indictment

18   were so serious that it increased his flight risk.  Your

19   Honor, this again, disagreed.  He was out on bond for two

20   years.  He did nothing wrong.  He surrendered early because

21   what my client wants to do is apologize to everyone, pay

22   his debt to society and get back to his family who

23   desperately needs him.

24             Your Honor, we're asking for a sentence of 92

25   months, and I'll be able to answer any questions you have.

```
 1           THE COURT:  Mr. Herdman, do you want to respond?

 2           MR. HERDMAN:  I do.  With respect to the

 3   analogizing where I tried to de-analogize, I suppose, I

 4   don't even know if that's a word, but to Wassim Masloum.

 5   Just to respond, my point, when Mr. Slade says that the

 6   offense that the defendant has pled to is less serious than

 7   956, all he's talking about is the maximum statutory

 8   penalties that's available, and that's just one

 9   consideration there.  When we talk about the severity of

10   the offense, the statutory offense that defendant has pled

11   to.  But obviously there's more than The Court has to

12   consider than just the --

13           THE COURT:  Well, it seems to me the conduct that

14   he engaged in along with his cousin extinguishes him from

15   Mr. Masloum and his conduct.

16           MR. HERDMAN:  Yes, Your Honor.  And that's the

17   same point I tried to make with Zubair Ahmed.

18           THE COURT:  That's the problem I have, quite

19   candidly.  To some extent they're quite similar.  He got --

20   I believe your client, in a sense, got deeper in, took more

21   steps both literally and figuratively.  He talked less

22   perhaps, or hardly at all, and certainly what happened

23   after the Cleveland encounter, after he returned from

24   Egypt, there was a distance, in fact, if not almost a form

25   of separation.  But if I recall quite distinctly, there was
```

 1   one contact between your client and Mr. Syed Haris Ahmed,

 2   and he basically turned his back on whatever was coming

 3   from Toledo to Chicago to reel him back in.  I understand

 4   that.

 5           MR. SLADE:  I agree that Mr. Masloum did not go

 6   to Egypt.  I also agree Mr. Masloum did not say no when

 7   Griffin asked him to join the terrorist cell.  My client

 8   did.  And I think, Your Honor, congress has said which

 9   defense is more serious in terms of setting the maximum

10   offense level, the sentencing commission said the same

11   thing in the guidelines, and that's my argument, Your

12   Honor.

13           THE COURT:  I understand.  Go ahead, Mr. Herdman.

14           MR. HERDMAN:  And the point Mr. Slade's made and

15   he made earlier goes to the heart of what we're talking

16   about here which is, in fact, Khaleel Ahmed may not have

17   joined a cell that was proposed by Darren Griffin because

18   he already had a cell with his cousin Zubair Ahmed, and

19   that cell, before he ever had contact with Darren Griffin

20   and it existed after he had contact with Darren Griffin,

21   and that goes to the heart of what this case is about, Your

22   Honor.  These two defendants trusted each other completely

23   because of their relationship and their friendship.  And in

24   some sense that puts us in an entirely different -- it's

25   not even similar on that level as if we're trying to draw

 1    similarities factually between Wassim Masloum and Khaleel

 2    Ahmed.  I think it collapses in the weight of the facts in

 3    this case because they're different.  You can't get to

 4    where defense counsel wants us to get by trying to

 5    analogize the behavior here.  And it does fall center

 6    around Darren Griffin.  And I would say that these

 7    defendants had their own cell already.  They didn't need

 8    Darren Griffin to advance what they were trying to do, and

 9    that's the point that stuck out to me the most that Mr.

10    Slade --

11              THE COURT:  Mr. Slade, anything further before I

12    call upon your client?

13              MR. SLADE:  I think the arguments are on the

14    table.

15              THE COURT:  Mr. Ahmed, you have the right to

16    speak on your own behalf before I proceed to announce

17    sentence.

18              KHALEEL AHMED:  Yes, Your Honor.  In contrast of

19    my cousin, first of all, I want to thank you for giving me

20    a chance to talk.  I'm in contrast with my cousin, I'm a

21    quiet person so I'm not comfortable enough to speak as

22    lengthy as my cousin.  But after expressing these few

23    words, I hope you make a relevant decision, it will make a

24    difference in the decision.  The steps I took to pursue

25    something from my misguided interest lead to a

```
 1   misapprehension of my personality.  I'm not a violent
 2   person, and I don't have any violent plans.  I've never
 3   hurt anyone in my whole life, and because of that --
 4   because of that behavior, I pled guilty and I accepted
 5   responsibility.  I feel remorseful pretty much to
 6   everything.  I want to apologize to the government, mostly
 7   my family, especially to you.  And while I'm in custody
 8   with the Federal Bureau of Prisons, you know, I plan on
 9   becoming -- I mean being productive to whatever programs
10   they have to offer.  And though I can't change my past, but
11   as a changed person I believe -- I believe the actions I've
12   taken were completely wrong, and it's a violent crime, and
13   as a changed person, I feel more apologetic to -- for what
14   I've done.  And in regards to that, pretty much I leave the
15   decision on Your Honor and hope for the best.
16           THE COURT:  I'm going to impose a term of
17   100 months, less than the government has requested, more
18   than the defendant's attorney very eloquently has asked me
19   to impose obviously.  I will express my reasons for doing
20   so in a moment.
21           Formally to pronounce sentence, pursuant to the
22   Sentencing Reform Act of 1984, 18 U.S. Code, Section
23   3553(A), it's the judgment of this court that Khaleel Ahmed
24   be and hereby committed to the custody of the Bureau of
25   Prisons be in prison for a term of 100 months.  I neglected
```

```
 1   to mention with regard to his cousin, I will acknowledge to
 2   both, it's my recommendation, I believe in any event it's a
 3   law that they both get credit for the time previously
 4   served.
 5            Upon release from imprisonment, defendant shall
 6   be placed on supervised release for a term of three years.
 7   Within 72 hours release from the custody of the Bureau of
 8   Prisons, he shall report in person to the United States
 9   pretrial and probation office in this district or in the
10   district to which he is released.  No fine will be imposed
11   and all restitution obligations, does have to pay a special
12   assessment of $100, hopefully if not paid will be withdrawn
13   from any prison earnings.
14            While on supervised release, defendant shall not
15   commit another federal, state or local crime, shall not
16   illegally possess controlled substances and shall comply
17   with all the standard conditions adopted by this court and
18   with the following additional conditions.  There's no drug
19   abuse background right, Mr. Slade?
20            MR. SLADE:  Your Honor, That's right.  I actually
21   forgot one thing.  I wanted to make the same request as
22   Mr. Gilbert for him serving confinement in one of two
23   facilities either Oxford or Terre Haute, Indiana, both of
24   them have medium security facilities, I think it would be
25   appropriate for Khaleel also --
```

```
 1              THE COURT:  I'm checking with the deputy.  I
 2    don't think that they can is the problem with their
 3    criminal history category.
 4              U.S. MARSHALL:  It's my understanding the Bureau
 5    of Prisons, due to the terrorism enhancement, initially
 6    they will go to a maximum security facility until they
 7    reclassify further on down the road.  That's my best
 8    understanding how the BOP's been going lately.
 9              THE COURT:  I certainly will recommend it because
10    it candidly --
11              MR. SLADE:  I think we all understand, Your
12    Honor.
13              THE COURT:  One looks past the labels and says,
14    wait a minute, what kind of custodial circumstances are
15    needed or best suited here, and that is not my call, but I
16    will make that recommendation.  I always think that it's
17    important, particularly when defendants as these two
18    defendants so clearly do, have family who are anxious to be
19    as supportive as they can.  That's crucial to anybody who's
20    confined, just a matter of common decency, and yet the
21    Bureau of Prisons has its own criteria and requirements,
22    and all I can do is recommend, which I will.
23              MR. SLADE:  We appreciate Your Honor's help.
24    Thank you.
25              THE COURT:  In any event, I will not impose the
```

1    drug testing requirement.  Defendant shall not possess a

2    firearm, destructive device, dangerous weapon.  While on

3    supervised release, you shall submit yourself and your

4    residence, place of business, computer, vehicle to a

5    warrantless search conducted and controlled by the U.S.

6    probation office at a reasonable time and in a reasonable

7    manner based on reasonable suspicion that he's in

8    possession of contraband or evidence of violation of

9    supervised release.  Failure to submit to such a search

10   will be grounds for revocation.  Defendant shall inform any

11   other residents that the premises may be subject to search

12   pursuant to this condition.

13          He shall provide the probation officer with any

14   and all requested financial information.

15          While on supervised release he shall diligently

16   seek to obtain, and if he obtains, diligently seek to

17   maintain lawful gainful employment.

18          He shall cooperate in the collection of DNA as

19   directed by the probation officer.

20          Let me tell both the defendants because it's my

21   custom to do so, you can never again lawfully possess a

22   firearm.  To do so would be a very serious federal offense,

23   and if you are found in possession of a firearm,

24   particularly in light of this conviction, I have no doubt

25   that you will be prosecuted under the applicable federal

```
 1    statute and receive a term of the maximum of which at
 2    present I believe is 10 years; is that correct?
 3              MR. HERDMAN:  Yes, Your Honor.
 4              THE COURT:  So does any party have any objections
 5    to any part of these proceedings not previously made?
 6              MR. HERDMAN:  Not for the government.
 7              THE COURT:  Mr. Slade?
 8              MR. SLADE:  None, Your Honor.
 9              MR. GILBERT:  No, Your Honor, we have one
10    request, though.
11              THE COURT:  Let me finish up and then I'll get --
12    I'll come back to that, Mr. Gilbert.
13              MR. SLADE:  Your Honor, I think we'd like to get
14    the indictment dismissed.
15              THE COURT:  That was the next stage.
16              MR. HERDMAN:  Okay.  You know, I may have missed
17    this, Your Honor, but with respect to your finding as to
18    Khaleel Ahmed, are they based on the same findings that you
19    gave for Zubair Ahmed, obviously different defendant taking
20    into account his circumstances?
21              THE COURT:  I will get into that.
22              MR. HERDMAN:  Okay.  And now I'm comfortable
23    dismissing the indictment with respect to Khaleel Ahmed as
24    well.
25              THE COURT:  Okay.  Mr. Ahmed, as I undertook to
```

1    explain to your cousin, and I realize it seems kind of odd,

2    but I do have to notify you, you may have a right to

3    appeal, although you've given up your right to appeal in

4    the plea agreement.  In any event, if you have a right to

5    appeal, you must exercise that right within ten days of the

6    entry of me by my written judgment, which will occur

7    sometime today or tomorrow.  And if you have such right and

8    you fail to file timely notice of appeal, you will lose

9    forever whatever right you might have to challenge your

10   conviction or your sentence.  Do you understand?

11           KHALEEL AHMED:  Yes, Your Honor.

12           PROBATION:  You waived the fine?

13           THE COURT:  And the bond has been discharged

14   already?

15           MR. SLADE:  As to Khaleel, that's true, Your

16   Honor.

17           THE COURT:  Let me say, well, first of all, in

18   terms of the consideration of the factors under 3553(A) and

19   the guidelines, I think I've already made clear my view

20   about the seriousness of the offense, and even though the

21   ultimate attempt was not accomplished, nonetheless, taking

22   the steps that were taken in this case constitute a very

23   serious violation of our law.  I hope that I note that

24   these sentences promote respect for the law.  I believe

25   that the sentence is just on the whole.

1              Mr. Slade, I want you to know that I've listened

2    very carefully to your comments and have taken them into

3    consideration.  The fact that they've had a favorable

4    effect on your client's ultimate sentence, if perhaps not

5    though, perhaps not the effect you had hoped to achieve.  I

6    am, quite candidly, more confident that with regard to

7    Khaleel Ahmed that the deterrent individual -- deterrent

8    effect for this entire experience and this sentence have

9    already been accomplished.  On the other hand, I think that

10   a fundamental importance that the public deterrent effect

11   be implemented, and that the people simply come to know

12   that engaging in this kind of conduct and this kind of

13   activity in taking steps, whatever they may be, steps

14   having been taken by Mr. Amawi and Mr. Masloum or

15   Mr. El-Hindi or the steps you took and your cousin took,

16   they may seem but modest.  They may not have much realistic

17   hope of accomplishment.  Nonetheless, given the underlying

18   intent and objective, they should be and will be certainly,

19   by this Court, dealt with most severely, and ultimately in

20   the hope that others learn from this example, and whatever

21   they may think that they simply do not act in any way

22   whatsoever in furtherance of those thoughts.

23              I believe that the sentence protects the public

24   as I believe and hope the one that I impose on Mr. Zubair

25   Ahmed does.

```
 1            I want to say something, quite candidly.  I had
 2    come into this anticipating the likelihood of imposing the
 3    maximum term under the guidelines.  I take note, as I hope
 4    the defendants do, of the government's having moved away
 5    from that, and having recommended to me a sentence less
 6    than what it might have sought and might have recommended,
 7    which, quite candidly, I anticipated it would recommend.
 8    And I think that the government is to be commended that at
 9    the end of the day when all of these cases and all of these
10    proceedings have come to an end, that it was willing to
11    enter into plea negotiations that I suspect was difficult
12    for it as they were for the Mr. Zubair Ahmed and
13    Mr. Khaleel Ahmed.  Nonetheless, that on behalf of the
14    United States, the United States Attorney's Office and
15    Department of Justice were willing to make a modest gesture
16    of leniency.  And I find that to be entirely appropriate.
17    Anything further for the government?
18            MR. HERDMAN:  No, Judge.
19            THE COURT:  Mr. Gilbert?
20            MR. GILBERT:  Your Honor, with all due respect
21    and I say this sincerely, I ask you to reconsider the 120
22    months for Zubair.  I just don't see why there should be a
23    20 month difference between the two cousins, and
24    particularly because he was assigned a one-point
25    enhancement.  And the government has always maintained, and
```

1    they just said earlier that the only difference between the

2    two individuals is that he was more communicative.

3              THE COURT:  Well, he also, Mr. Gilbert, and if

4    I'm wrong, tell me, because it plays a considerable role,

5    was quite actively engaged in the communications with

6    Mr. Syed Haris Ahmed.  I realize that he may have played a

7    role in that individual's ultimate conviction, but if I

8    read the presentence report correctly, and again, if I did

9    not, tell me, Mr. Syed Haris Ahmed, of all the people with

10   any connection with these defendants or indeed with the

11   other three who are before me, and of course he had none

12   with them.  But nonetheless, he was committed, and he was

13   abroad literally undertaking to further the aims and

14   objectives that your client and he were discussing.

15             MR. GILBERT:  Judge, what they did was just

16   communicate with each other, there was no plan between the

17   two of them.  In fact, Mr. Haris encouraged him to come to

18   meet him in Georgia, and he never did that.  I mean, to --

19   I just don't see how you can justify not giving at least

20   some consideration to the fact that two of these guys were

21   in this together.  I mean, we already had given Zubair --

22             THE COURT:  Mr. Gilbert, rightly or wrongly, I

23   take from the presentence report and what I know about

24   their conduct.  The conclusion that your client was more

25   actively involved and more thoroughly committed and played

1   a role of some influence, if not significant influence,

2   vis-a-vis of his cousin.  He was older, he was, I think,

3   according to my understanding, more dedicated to his

4   religious beliefs and principals, and I find that his

5   culpability is more significant.

6            MR. GILBERT:  But there's no evidence of that.

7            THE COURT:  Pardon?

8            MR. GILBERT:  I don't think there's any evidence

9   of what you just said.  I don't think the government is

10  saying that he induced his cousin to join.

11           THE COURT:  I think he played an influential

12  role.  That's my understanding and impression.

13           MR. HERDMAN:  And Your Honor, best evidence of

14  this, the fact that defendant accepted his plea agreement

15  with the two-level enhancement for assuming a leadership

16  rope in this conspiracy.  And that should end this

17  argument.

18           MR. GILBERT:  One level.

19           MR. HERDMAN:  No, it was two levels.  And the

20  defendant got an additional level in terms of his

21  cooperation.  And quite frankly, that was because he was

22  able to provide --

23           MR. GILBERT:  So why doesn't that take care of

24  the issues that we're talking about?  Why doesn't the role

25  enhancement be sufficient to take into account the

```
 1    differences between these two individuals?  When in the

 2    same breath the government gets up there and says that they

 3    were lockstep and the whole process from day one.  I mean,

 4    I just -- I'm sorry, I just don't get that defense.

 5              THE COURT:  Mr. Gilbert, I tried to express

 6    myself as best I can.

 7              MR. GILBERT:  And the other thing I want to

 8    say --

 9              THE COURT:  And if you find that there is no

10    basis in the record, I guess you can't -- you can't appeal.

11    I candidly wish you could because I would be perfectly

12    content to have you take the reasons that I've expressed

13    down to Cincinnati and say Judge Carr was wrong.  He didn't

14    have the basis for the distinction that he drew and the

15    difference in the sentence.  To repeat, it is my impression

16    and my finding that your client was more culpable both in

17    terms of his commitment, in terms of his relationship with

18    his cousin and in terms of the activities that he undertook

19    with Syed Haris Ahmed.  And again, he was the one directly

20    in contact with Mr. Syed Haris Ahmed who himself was, as I

21    understand it, abroad literally in various places in this

22    country and Canada as well; is that correct, Mr. Herdman?

23              MR. HERDMAN:  I'm sorry, Your Honor?

24              THE COURT:  Syed Haris Ahmed was also active in

25    Canada?
```

1          MR. HERDMAN:  He traveled to Canada.

2          THE COURT:  That's what I mean by --

3          MR. HERDMAN:  Yes.

4          THE COURT:  And the understanding that I have is

5     that those travels and that activity was in furtherance

6     ultimately of objectives that, of the same sort, that bring

7     your client and his cousin here today.  If I'm wrong about

8     that, tell me.

9          MR. GILBERT:  Well, I think, well, to a respect

10    you're wrong.  The activities of Syed Haris going to

11    Pakistan and going to Canada had absolutely nothing to do

12    with Zubair.  They were not even talking about that.

13         THE COURT:  I know they were not talking about

14    it.  But on the other hand, that's what Mr. Syed Haris

15    Ahmed was about, and I don't suggest that there's a

16    conspiracy or whatever, but the fire with which your client

17    was playing in his contacts and communication and

18    electronic correspondence with Syed Haris Ahmed ultimately

19    was far more dangerous.

20         Part of what I'm trying to do is to send a

21    message, somebody starts talking Jihad this and Jihad that,

22    walk, do not run -- run, do not walk away from that

23    individual.  Your client did not.  And I'm trying to tell

24    anybody else who may be inclined or have the opportunity or

25    be induced or sucked into that kind of conversation has to

1  understand it has consequences.  That ultimately is what

2  I'm trying to accomplish by making an example of your

3  client.  The same thing I was trying to do with the Amawi,

4  Masloum and El-Hindi conversation.  Steve Hartman was

5  absolutely correct, take Darren Griffin out of that case

6  and there is no case.  Those three people hardly knew each

7  other before he put them together and put them into prison.

8  And anybody out there who hears that kind of talk from

9  anybody else should run away if they don't want to find

10  yourselves where your client, Mr. Slade's client, and the

11  other three defendants in this case now find themselves.

12  That's the message I'm trying to send.  It may not be

13  heard.  It may not be effective.  It may not be publicized

14  by the government.  Lord knows I looked in vain at the

15  press reports in my last sentencing that somebody somewhere

16  would have picked that up, but they didn't.  Fox News, I'm

17  told, I don't get cable, spent much of that trial with

18  leading the story, about with pictures of the twin towers

19  burning, terror in Toledo, but when the time comes for the

20  news media to pick up on what really happens in these

21  cases, where are they?  But that's all I can do.  Your

22  client persisted in engaging in communications that

23  ultimately, had he not been caught, captured and confined

24  and had Mr. Syed Haris not been captured caught and

25  confined, could have led to the fulfillment of the

1    objectives that took them to Egypt.  Now, that may not seem

2    to make sense to you, but ultimately what this case and

3    these sentences are trying to accomplish is to make clear

4    to anybody who in any way has it in his or her mind to

5    engage in acts of terrorism against the citizens or

6    soldiers of the United States of America, ought to

7    understand the dangers of following up on that.  You can

8    think what you want about this country, and I think a lot

9    of things are probably not particularly popular about what

10   we're doing in the Middle East and Afghanistan, but I'm

11   entitled to think so, but I cannot follow up on that

12   without putting myself at the risk that has led these

13   clients here.  That is why I imposed the sentence I did on

14   your client.  He kept in communication, he kept in

15   correspondence.  He kept thinking about it.  He abandoned

16   his dedication to it only upon being arrested.  I believe

17   that Khaleel, his cousin, literally walked away from that

18   sooner and more thoroughly, as did Mr. Masloum.  That's the

19   bottom line as to why your client got the additional time

20   to be an example.  Somebody comes to you -- I'll say it for

21   the third and last time -- talking about Jihad this and

22   Jihad that and Jihad the other thing and doing the kinds of

23   things that all five of these defendants did or talked

24   about doing, beware.  Watch out.  Because if you start

25   taking steps, no matter how small, in no absolute terms how

1    significant they are, I can't remember who it was that went

2    out to the firing range, Clelands in the other case, that's

3    it.  Masloum buys the paintball gun, that's the heaviest of

4    the armament among the three of them and look what

5    happened.  And that's the message I'm trying to send.

6    Whether it's even broadcast literally or figuratively or

7    not.  That's all I can do as a Judge.  That's what

8    deterrence, public deterrence is all about, is to warn

9    people, do this and that's what can happen.

10             Mr. Herdman, anything further from the

11   government?

12             MR. HERDMAN:  No, Your Honor.

13             THE COURT:  Mr. Gilbert?

14             MR. GILBERT:  Your Honor, I was wondering if my

15   client could have an opportunity to speak with his family?

16             THE COURT:  It's normally my practice to let that

17   happen if it's agreeable with the marshals.

18             U.S. MARSHALL:  For a short amount of time, Your

19   Honor, but no personal contact.

20             THE COURT:  Yeah, whatever they are willing to

21   permit you to do.  That will conclude these proceedings.

22

23

24

25

C E R T I F I C A T E

     I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


s:/Angela D. Nixon

--------------------------                    -----------

Angela D. Nixon, RPR, CRR                     Date